**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA,

Plaintiff,

v.

JOSE M. MARTINEZ-HERNANDEZ,

Defendant.

CRIMINAL NO. 22-212 (ADC)(HRV)

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

## I.   Introduction

Pending before the Court is defendant José Manuel Martinez-Hernández' (hereinafter "Mr. Martinez" or "defendant") "Motion to Suppress" (Docket No. 42), and his "Motion to Dismiss Indictment, Second Motion to Suppress and/or to Comply with Brady Material." (Docket No. 92).  The United States filed a response in opposition. (Docket No. 43).  These motions have been referred to me for report and recommendation. (Docket Nos. 60 and 101).  I held evidentiary hearings on March 4 and May 14, 2024. (Docket Nos. 80 and 110).  For the reasons set forth below, I recommend that both motions be DENIED.

## II.   Procedural Background

### *The Charges*

On May 17, 2022, a grand jury sitting in this district returned an indictment charging Mr. Martinez in two counts. (Docket No. 10).  Count one alleges that Mr.

Martinez possessed with intent to distribute 500 grams or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). (*Id.*) Count two charges possession of a firearm in furtherance of a drug-trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i) and (b)(1)(B)(ii) (*Id.*)  These charges arose out of a Puerto Rico Police Bureau ("PRPB") intervention that took place on May 11, 2022.  The controlled substance and firearm that form the basis of the charges in the indictment were discovered by the police inside Mr. Martinez' vehicle.

### The Original Motion to Suppress

On August 1, 2023, Mr. Martinez moved to suppress the fruits of what he claims was an unconstitutional seizure of his person and search of the vehicle he was driving. (Docket No. 42).  First, he argues that he was in custody without being advised of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).  Second, defendant contends that PRPB agents were required to obtain a warrant to search the vehicle and the lunchbox where the cocaine was eventually found. Third, Mr. Martinez appears to argue that a *Terry* stop conducted by the PRPB agents became a "de facto arrest" without probable cause and without giving him *Miranda* warnings. Fourth, the defendant claims that he did not voluntarily consent to a full search of his car.  Fifth, the defendant moves to suppress a statement subsequently given to federal agents as fruit of the claimed Fourth and Fifth Amendments violations.

### The United States' Response

The United States opposes Mr. Martinez' motion to suppress the cocaine and firearm for three reasons. (Docket No. 43). The government first submits that the defendant consented to a search of the vehicle.  Second, the government argues that the

search was reasonable pursuant to the automobile exception because the agents had probable cause that the defendant was illegally possessing a firearm. Lastly, the government maintains that the contraband would have been inevitably discovered once the vehicle was seized and inventoried. As to the statements subsequently given to the federal agents, the United States claims that the defendant made a knowing and voluntary waiver of his *Miranda* rights, and that the fruit-of-the-poisonous-tree doctrine does not apply in this case.

### *March 4, 2024, Evidentiary Hearing*

I held an evidentiary hearing on March 4, 2024. (Docket No. 80).  The government called PRPB Agent Ricardo Martinez-Natal ("agent Martinez-Natal") as its first witness. After the lunch recess, and during the cross-examination of the agent, counsel for the government brought to my attention that he had just informed defense counsel that a GPS tracker had been judicially authorized for defendant's car and that federal agents had communicated to agent Martinez-Natal to be on the "lookout" for the white Lexus. I then explored with the parties how they wanted to handle the issue.

After some back and forth, the parties agreed that the best course of action was to recess the hearing.  The parties would jointly meet with the agent to inquire how much he knew about the GPS tracker, and then file a joint informative motion providing dates for resuming the suppression hearing.  After the joint informative motion was filed, the continuation of the suppression hearing was set for May 14, 2024. (Docket Nos. 81, 82).

### *Motion to Compel Brady Disclosure and Second Motion to Suppress*

On March 18, 2024, Mr. Martinez filed a motion styled "Motion to Compel Brady Discovery." (Docket No. 87).  In it, the defendant requested an order from the court

3

compelling the government to disclose a number of items related to the matter of the GPS tracker.  The defendant requested the following items:

a.      GPS Tracking Device 2021-2022 2023- 2024.
b.      The Court order issuing the legal usage of the GPS Tracking Device.
c.      The trajectory of the GPS Tracking Device for May 12, 2022.
d.      The Puerto Rico Police Work Plan for May 12, 2022.
e.      Police Inventory marking the GPS device's location on vehicle.
f.      Any and all pictures of GPS attached to vehicle of Jose Martinez.

(Docket No. 87 at 2.)  Then, on March 25, 2024, Mr. Martinez filed his "Motion to Dismiss Indictment, Second Motion to Suppress and/or to Comply with Brady Material." (Docket No. 92).  The defendant argued in that second motion "that the traffic stop was a subterfuge to in fact search and seize defendant's vehicle and put him under arrest" because the PRPB agents were following instructions from an ATF agent to "keep an eye on defendant's vehicle." (*Id*. at 1-2).  The defendant reiterates his argument that he was entitled to be provided materials related to the GPS tracker because this was evidence that is both relevant to the suppression issue and constitutes exculpatory/impeachment evidence under *Brady* potentially establishing that the traffic stop was pretextual.

The United States opposed the defendant's *Brady* request. (Docket No. 93).  As the government sees it, the materials requested are irrelevant because after the brief conversation the parties had with agent Martinez-Natal, it became clear that he was unaware of the GPS tracker.  He did confirm that an ATF agent told him to look out for the defendant's car; that the defendant could be involved in a drug transaction; and to conduct a traffic stop if he saw a traffic violation. According to the government, the subjective intent of the agent is irrelevant as long as the traffic stop is objectively reasonable, that is, supported by probable cause of the traffic violation.

4

After reviewing *ex-parte* the GPS tracker warrants and supporting documents, and carefully considering the arguments of the parties, I ruled that the requested materials needed not be disclosed.  I specifically stated:

> The Court agrees with the arguments of the government at Docket No. 93. The discovery items requested are not relevant. See United States v. Lawson, No. 15-cr-0019-PJH-1, 2016 U.S. Dist. LEXIS 21034 at *68-69 (N.D. Cal. Feb. 18, 2016)(upholding the validity of a traffic stop because police officer had reasonable suspicion to believe that defendant violated provisions of the Vehicle Code; it did not matter that the stop was at the behest of a DEA agent that was tracking the vehicle). Moreover, the requested discovery is not Brady material. The Defendant has been provided with information, and an opportunity to interview the PRPD agent, and is able to explore through cross-examination whether having prior knowledge to be on the lookout for the vehicle calls into question the validity of the traffic stop, or the agent's credibility.

(Docket No. 97).  I also denied a motion for reconsideration filed by Mr. Martinez. (Docket Nos. 99, 100).

### *The May 14, 2024, Further Suppression Hearing*

At the continuation of the suppression hearing, Mr. Martinez, through counsel, resumed cross examination of agent Martinez-Natal. (Docket No. 110). The government also presented the testimonies of PRPB agent Wally Matos-Rivera and former ATF Special Agent Idalis Torres. (*Id.*)  Several exhibits were also admitted. (Docket Nos. 107 and 108).  The defense presented no witnesses.

### *Post-hearing Briefing*

The parties have submitted post-hearing memoranda. (Docket Nos. 111, 112).  In his submission, the defendant argues again that the PRPB agents made a pretextual stop of Mr. Martinez' vehicle based on the information relayed by an ATF agent.  Moreover,

5

the defendant maintains that the automobile exception to the warrant requirement is not applicable because based on an executive order issued by the governor of Puerto Rico related to the COVID-19 pandemic, his firearms permit was not expired. On the contrary, its validity had been extended by virtue of said executive order. Accordingly, the defendant claims that the agent did not have probable cause to search the vehicle. Further, the defendant contends that the agent exceeded the scope of the consent given and that said consent was not voluntary because the agent "misinformed" him of his rights and provided "deceitful information" to induce him to consent to the seizure of his legal firearm. Mr. Martinez makes reference again to the executive order extending the validity of expired firearms permits. He also asks the Court to suppress the statements subsequently given to federal agents for they are, according to him, fruit of the poisonous tree. Lastly, Mr. Martinez avers that the inevitable discovery doctrine does not apply because the traffic violations at issue "do not warrant a subsequent inventory search." (*Id.* at 14).

For its part, the United States summed up its position that following a valid traffic stop, and upon learning that the defendant "illegally possessed a firearm", the automobile exception allowed the PRPB agent to search without a warrant anywhere in the vehicle where a firearm and ammunition might be, including the lunchbox where the half kilogram of cocaine was found. The government also argued that Mr. Martinez voluntarily consented to a search of the car. And to the extent the consent given could arguably be interpreted as limited to searching for, and seizing the firearm and ammunition, the agent did not exceed the scope of the consent based on objective reasonableness. The government further maintains that agent Martinez-Natal's lack of

familiarity with the governor's executive order was understandable given the number of ever-changing executive orders. In any event, says the government, the agent's ignorance of said executive order falls directly within the good-faith exception to the exclusionary rule pursuant to the attenuation doctrine. There was no deliberate deception on the part of the agent and any incorrect understanding anent the executive order did not play a role in the consent given by the defendant. The government further claims that the contraband would have inevitably been found since the defendant had an expired driver's license. Police procedures called for impoundment of the vehicle and an inventory search would have revealed the drugs, gun, and ammunition. Finally, the government submits that the statements given to federal agents were the result of a voluntary and knowing waiver of rights and not the result of a constitutional violation.

## III.   Findings of Fact

With the benefit of the parties' pre-hearing written submissions, the documentary and testimonial evidence received at the hearings, and the parties' post-hearing memoranda, I now make the following findings of fact. Unless otherwise noted, these facts are not disputed. Citations to the transcript at Docket No. 104 will be "Tr."

### *The initial intervention*

Agent Martinez-Natal, a 15-year veteran of the PRPB, is currently assigned to the Metropolitan Drug Division. In May of 2022, he was assigned to the San Juan motorized unit. On May 11, 2022, he was patrolling in the area of Bayamon along with fellow PRPB officer Wally Matos-Rivera in an unmarked patrol car that was equipped with blue lights and a siren. Upon being shown government's Exhibit 1, a map, agent Martinez-Natal was

able to identify it as Road 167, one of the areas he and his partner were patrolling that day.

As agent Martinez-Natal was patrolling down Road 167, he saw a white four-door Lexus with "quite dark tinted windows." (Tr. 6). Subsequently, the agent observed the Lexus perform an illegal lane change. As the Lexus drove past the patrol car by the right side, agent Martinez-Natal noticed that the registration sticker (marbete) was expired. He was able to so conclude because the color of the sticker was the wrong color for the year. When the Lexus drove past the agents, the driver rolled the windows down. Agent Martinez-Natal notified radio control that he was about to intervene with the white Lexus. The agents conducted a traffic stop. Agent Wally Matos provided back-up by standing on the sidewalk on the passenger's side of the Lexus.

Agent Martinez-Natal informed the driver the reasons for the stop. The driver, who was identified in open court by the agent as Mr. Martinez, informed the agent that he had the current registration sticker but had not posted it because he needed to change the window tints. The agent informed the driver that not having the sticker affixed to the windshield was a violation. Agent Martinez-Natal requested the driver's license. The driver's license produced by Mr. Martinez was expired. In view of the expired driver's license, agent Martinez-Natal explained that procedure dictated that he had to call a relative or someone close to him to move the vehicle. Otherwise, the agent had to get Mr. Martinez out of the vehicle and seize it. The agent also explained that the driver could not legally drive away the car with an expired license. He gave the driver the option, because he was under a work plan, and that would have been the fastest and safest way to end the intervention. This accommodation provided to a driver, the agent explained,

8

is not a legal requirement. It is a courtesy that can be extended at the discretion of the intervening officer. Agent Martinez-Natal acknowledged that the traffic violations at issue were not arrestable offenses. They were simply administrative violations calling for the issuance of a ticket.

Mr. Martinez made a phone call and told the agent that someone would come to the scene between ten to fifteen minutes. According to agent Martinez-Natal, the defendant voluntarily told him that he had lost his job and that he had recently started working as a security guard. This fact is disputed by Mr. Martinez who at a subsequent interview with federal agents asserted that it was the agent who asked him what he did for work. Upon learning that defendant was working as a security guard, agent Martinez-Natal asked if he worked as an **armed** security guard, to which defendant replied in the affirmative. Agent Wally Matos confirms that it was agent Martinez-Natal who asked the defendant if he was armed. Mr. Martinez also indicated that he had a "carry permit" and pointed to the firearm being wedged in between the driver's seat and the center console compartment of the car. Agent Martinez-Natal requested to see the firearms permit and it turned out that it was also expired as per the date on the card. The agent ordered Mr. Martinez to turn the vehicle off and to dismount it as he needed to corroborate the information. Mr. Martinez was told to stand in the back of the vehicle in a safe area and to not touch the firearm. Then, agent Martinez-Natal explained that he had to seize the firearm in the car and any firearms under his name, as well as any rounds of ammunition.

### Consent

At this point, the agent had Mr. Martinez sign a vehicle consent form to seize the firearm and rounds of ammunition from inside the vehicle. Mr. Martinez did not express

any reservations about the consent form, nor did he have any questions.  During this process, Mr. Martinez directed the agent to where the firearm was.  He also mentioned magazines for the Glock pistol and rifle magazines being in the "back" of the car.  As to the rifle, Mr. Martinez informed the agent that it was not in the vehicle but at his house on top of a sofa. The signed consent form was admitted into evidence as government's Exhibit 41.

    After describing the contents of the consent form, the agent once again expressed that the purpose of the consent was "for me to be able to enter [defendant's] vehicle and to seize the firearms and the rounds of ammunition that were in his name." (Tr. at 22). Exhibits 11 through 35 were then introduced by the government as photographs depicting aspects of the intervention and, specifically, where the firearm and ammunition were found inside the car.  Mr. Martinez stood with officer Wally Matos at a reasonable distance to observe the process.

### *The PRPB agent finds half a kilogram of cocaine*

    In the process of searching for the firearm, magazines and ammunition, agent Martinez-Natal received guidance from Mr. Martinez, but he was not just going "to take his word" as to where the gun, magazines or bullets would be found.  He "was going to search where he could store . . . the magazines to a rifle . . . irrespective of where [defendant] said they might be." (Tr. at 28).   When the agent entered the back seat area to search for magazines, the only container he saw where the magazines could be found was a lunchbox.  When the agent took the lunchbox, he immediately heard Mr. Martinez tell officer Wally Matos: "arrest me." (Tr. at 29).  Upon hearing that, agent Martinez-

10

Natal inquired "what happened" and Mr. Martinez tells the agent "I said arrest me because with what's in there I know you are going to arrest me." (*Id.*)

The agent opened the lunchbox and found what appeared to be a kilo of cocaine. Agent Martinez-Natal tells agent Matos to arrest Mr. Martinez. As officer Matos was taking the handcuffs out, Mr. Martinez grabbed them and placed them on himself. Government exhibits 22 and 23 depict the cocaine found.  Agent Martinez-Natal called for technical services and a supervisor to arrive at the scene. The additional personnel arrived, a complaint number was assigned, and efforts were made to get the white Lexus towed.  Technical services took pictures and agent Martinez-Natal read Mr. Martinez the *Miranda* rights.  By this time, the whole intervention had lasted approximately 35 or 40 minutes. Once the process at the scene concluded, the vehicle was towed, and Mr. Martinez was taken to the motorized unit.

### *Seizure of the rifle*

Once at the police station, agent Martinez-Natal explained to Mr. Martinez that they needed to go to his house to seize the other firearm—a rifle—that was under his name.  At Mr. Martinez' house, more precisely, in front of his house, the agent had the defendant sign another consent form. (Exhibit 42).  This consent form authorized the agents to enter the house and seize the rifle.  The rifle was found exactly where Mr. Martinez said it would be: on top of the sofa. (Exhibit 37).

In explaining why he needed to seize all firearms and ammunition in the possession of Mr. Martinez and under his name, agent Martinez-Natal testified that it was the procedure due to the expired firearms permit as well as because it became "criminal material" after cocaine was found. (Tr. at 39).

### *Procedures when a vehicle is seized on the side of the road*

Agent Martinez-Natal explained the procedure when a vehicle is seized. The vehicle is taken to the station and a PPR-128 form is completed.  A PPR-128 form is executed following an inventory search "to identify any belonging of value or anything criminal inside it." (Tr.40).  It must be done with respect to any vehicle that is seized by the police; it is not optional.  In this case, the white Lexus was taken to the police station and an inventory search was conducted in the presence of Mr. Martinez.

### *Traffic tickets are issued*

Government exhibits 43 and 44 represent the traffic tickets issued by agent Martinez-Natal on May 11, 2022.  One for not having the registration sticker (marbete) on the windshield and one for improper lane change.

### *Agent Martinez-Natal is told to look out for the Lexus*

On May 11, 2022, Agent Martinez-Natal received instructions as part of the work plan for that day, to be on the lookout for a white Lexus.  He was not clear about exactly when he received the instruction.  Moreover, answering questions posed by me, the agent responded that he was not told in real time the location or movements of the car.

### *The COVID-19 executive order*

After getting agent Martinez-Natal to admit that not knowing the law does not excuse him from his actions, the defense introduced into evidence, without objection from the government, Executive Order 2020-035 of the Governor of Puerto Rico. (Exhibit A).  The purpose of the executive order was to extend the validity of the weapons permits granted under Law 400-2000, as amended, that had expired since the effective date of law 168-2019, until the end of the emergency caused by COVID-19.  (*Id.*)  Agent

Martinez-Natal was confronted with the executive order after he denied that it was in effect at the time of his intervention with Mr. Martinez. However, no follow up questions were asked by the defense on the specific subject of the agent's understanding about the effect and scope of the executive order.

On re-direct by the government, the agent stated that he was not aware of the executive order at the time of the stop. Agent Martinez-Natal learned about the executive order after the intervention with the defendant. At the time of the intervention with Mr. Martinez, the agent's understanding was that when presented with a scenario of an expired firearms permit, the procedure was to seize the firearms registered under the person's name as well as any ammunition.

### *Miranda warnings*

Exhibit B introduced by the defense shows that Mr. Martinez was provided with, and signed, a written document acknowledging and waiving his *Miranda* rights at 2:10 PM. This happened after the defendant had been arrested for several hours, and after agents had taken him to his residence to seize the other firearm he owned. Agent Martinez-Natal testified, however, that upon arresting the defendant, he verbally read him the *Miranda* warnings. (Tr. 31).

### *ATF interviews Mr. Martinez and assumes jurisdiction*

On May 11, 2022, former ATF Special Agent Idalis Torres ("agent Torres") was called by the San Juan motorized unit and responded to the Bayamon precinct along with her partner Special Agent Roberto Santiago. They arrived at the Bayamon precinct at approximately 12:30 P.M. and subsequently interviewed Mr. Martinez. Mr. Martinez was sitting down and handcuffed. Defendant's demeanor was calmed and remained so

throughout the interview. He was also provided food. The interview was recorded, transcribed, and translated. (Government's Exhibits 45 and 45A). It lasted approximately 17 minutes.

Prior to beginning the interview, *Miranda* rights were read to Mr. Martinez. He did not have any questions. Agent Torres had no reason to believe that Mr. Martinez did not understand his rights. Further, Mr. Martinez was explained, initialed, and signed a form acknowledging and waiving his *Miranda* rights. (Exhibits 46 and 46-A).

During the interview, Mr. Martinez related to agent Torres what transpired at the scene of the traffic stop. Relevantly, Mr. Martinez informed that the police officer ordered him to stop "[b]ecause of improper change of . . . lane and the registration and insurance sticker . . . I have the sticker in the car but it wasn't affixed." (Docket No. 107-1 at 53). He further states the officer "explains to me the process that he more or less has to do, because I don't have a license, blah, blah, blah, and he asks me what I work in. And I tell him security." (*Id.* at 54).

The officer then asked Mr. Martinez whether he was armed. "You know, whether I have [a license] to carry weapons since I told him that I was in security." (*Id.*). The defendant then expresses to the federal agents: "I handed him the license . . . The license right now is expired." (*Id.*) The license expired in April, that is one month before the intervention. (*Id.*) Mr. Martinez explained that he had an appointment to renew it, but that he had been given a term "because of the COVID thing." (*Id.* at 55).

Mr. Martinez continues to relate that upon receiving the expired firearms permit, the agent instructed him "to slowly remove [his seat]belt, and asked [him] where it was." (*Id.*) After getting out of the car and telling the agent where the gun was, Mr. Martinez

indicates that the agent "made [him] fill out a paper, like to, take the gun." (*Id*. at 56). When asked by the federal agents whether he consented to a search of the vehicle, Mr. Martinez answered that it was a consent "[T]o pick up the gun." (*Id*. at 57). Later during the interview, and with respect to the consent form signed, Mr. Martinez reiterated that the agent told him "that was the authorization . . . for him to take the weapon." (*Id*. at 59). Mr. Martinez likewise explained that the PRPB agent asked him if there were magazines inside the vehicle to which he replied in the affirmative. (*Id*. at 60). The defendant then detailed the type and quantity of magazines and ammunition as well as where they were recovered from inside the car. (*Id*. at 60-61).

**IV.    Applicable Law and Discussion**

*Traffic Stop: Automobile Exception*

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend IV. There is no question that a seizure occurs "when a police officer 'has in some way restrained the liberty of a citizen' through 'physical force or show of authority.'" *United States v. Camacho*, 661 F.3d 718, 725 (1st Cir. 2011)(*quoting Terry v. Ohio*, 392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)). And for several decades now, the Supreme Court has held that the stop of a motor vehicle due to a traffic violation constitutes a Fourth Amendment seizure. *Delaware v. Prouse*, 440 U.S. 648, 653 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979). As such, said seizure must be supported by reasonable suspicion that a traffic violation was committed. *United States v. Chaney*, 584 F.3d 20, 24 (1st Cir. 2009)(*citing Brendlin v. California*, 551 U.S. 249, 255, 127 S.

Ct. 2400, 168 L. Ed. 2d 132 (2007)).[1]  "When an unconstitutional seizure occurs, courts enforce the Fourth Amendment's proscription by excluding evidence obtained during said seizure." *United States v. Howard*, 66 F.4th 33, 41 (1st Cir. 2023)(*citing Camacho*, 661 F.3d at 724).

Moreover, once a police officer stops a vehicle, "the tolerable duration of police inquiries . . . is determined by the seizure's mission—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 353, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015)(cleaned up).  To carry out the mission of the stop, an officer is permitted to undertake those "ordinary inquiries incident to [the traffic] stop." *Id.* at 355 (*quoting Illinois v. Caballes*, 543 U.S. 405, 408, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005).  Valid inquiries include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* (*citing Delaware v. Prouse*, 440 U.S. at 658-660). "Authority for the seizure thus ends when the tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 354 (*citing United States v. Sharpe*, 470 U.S. 675, 685, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985)). Put differently, "[t]he seizure remains lawful only 'so long as [unrelated] inquiries do not

---

[1] The First Circuit has recently expressed that "[t]here may not be complete clarity as to whether a stop for traffic violations must be supported by probable cause or reasonable suspicion." *United States v. Potter*, 78 F.4th 486, 488 (1st Cir. 2023)(cleaned up).  Ultimately, the Court found it unnecessary to address the issue because its finding of lack of reasonable suspicion necessarily entailed a lack of probable cause.  Here, on the contrary, I find that there was probable cause that the traffic offenses occurred.  Therefore, the higher standard has been satisfied.

measurably extend the duration of the stop.'" *Id.* at 355 (*quoting Arizona v. Johnson*, 555 U.S. 323, 333, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009)).

Indeed, the actions undertaken by an officer pursuant to a traffic stop "must be reasonably related in scope to the stop itself 'unless the police have a basis for expanding their investigation.'" *United States v. Ruidiaz*, 529 F.3d 25, 29 (1st Cir. 2008)(*quoting United States v. Henderson*, 463 F.3d 27, 45 (1st Cir. 2006)).   In other words, "while an officer's actions must bear some relation to the purpose of the original stop, [officers may shift their] focus and increase the scope of [the] investigation by degrees if [their] suspicions mount during the course of the detention." *United States v. Chhien*, 266 F.3d 1, 6 (1st Cir. 2001).

In this case, it is undisputed that the initial traffic stop was justified due to traffic violations.   Agent Martinez-Natal credibly testified that defendant made an illegal lane change, the vehicle had suspected illegal tinted windows, and he was able to observe that the registration sticker (marbete) of the Lexus was expired. The defense has not sufficiently contested that these violations occurred.   In fact, traffic tickets were issued as to two of the observed traffic offenses. (Exhibits 43 and 44).   That the traffic offenses occurred as described was substantially corroborated by the testimony of agent Wally Matos.   Accordingly, there was probable cause that traffic violations occurred justifying the stop of Mr. Martinez' vehicle.

The crux of Mr. Martinez' challenge to the initial intervention is that the stop was pretextual.   He points to evidence received at the hearing that agent Martinez-Natal was told by a federal agent to be on the lookout for the white Lexus as well as information

obtained during the course of the hearing that a GPS tracker had been installed on the car.  For the reasons that follow, this argument misses the mark.

An officer can stop of a vehicle "if he sees a driver commit a traffic offense, even if the stop is just an excuse to investigate something else." *United States v. McGregor*, 650 F.3d 813, 820 (1st Cir. 2011)(*citing Whren v. United States*, 517 U.S. 806, 810, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996)).  In analyzing the constitutional reasonableness of a traffic stop, the actual motivation of the individual officer is irrelevant. *See United States v. Miles*, 18 F.4th 76, 79 (1st Cir. 2021)(citations omitted).  "As long as a traffic stop is warranted by objectively reasonable facts, a claim that the officer making the stop was acting in accordance with some hidden agenda will not ground a successful Fourth Amendment challenge." *Id*. at 80.  Again, the initial intervention in this case was legal.  Regardless of subjective motivation, the officers had probable cause that traffic offenses occurred. *See United States v. Lawson*, No. 15-cr-0019-PJH-1, 2016 U.S. Dist. LEXIS 21034 at *68-69 (N.D. Cal. Feb. 18, 2016)(upholding the validity of a traffic stop because police officer had reasonable suspicion to believe that defendant violated provisions of the Vehicle Code; it did not matter that the stop was at the behest of a DEA agent that was tracking the vehicle).

Moreover, almost immediately after the traffic stop was initiated, the officer learned that the defendant had an expired driver's license.  The uncontested testimony at the hearing was that Mr. Martinez could not legally drive the car away.  Accordingly, he was provided two options. Option one was to call a relative or friend to come to the scene to assist in moving the car.  This was not an accommodation that agent Martinez-Natal was legally required to make; but it was a courtesy that in his discretion he could

18

grant.  Option two was to seize the car and have it towed.  Mr. Martinez initially sought to avail himself of option one.  Agent Martinez-Natal testified that Mr. Martinez made a call and expressed that someone would come to the scene to drive the car.  There was no evidence presented that someone related to Mr. Martinez ever arrived at the scene of the traffic stop.  Therefore, up to this point, the mission of the traffic stop had not concluded, and it was thus objectively reasonable for the seizure to be extended.  *See United States v. Corbett*, No. 22-cr-00023-LEW, 2024 WL 150092, 2024 U.S. Dist. LEXIS 6443 at *9 (D. Me. Jan. 12, 2024)(stop was not impermissibly expanded because the vehicle could not be driven away due to expired registration.).

It was in the context of the wait for an authorized driver that the defendant and the officer engaged in conversation about what Mr. Martinez did for work.  Whether it was agent Martinez-Natal who asked, or Mr. Martinez who volunteered the information, it is immaterial for purposes of the analysis.[2]  The fact of the matter is that agent Martinez-Natal learned that the defendant was armed and that his firearms permit was expired, at least as it appeared from the face of the document. What happened next was informed by this development. The agent removed Mr. Martinez from the vehicle intent on seizing any firearms and ammunition.  I find that there was no legal basis for this action.

_____

[2] The facts do not show that any questions posed by the officer—assuming for the sake of argument that it was the agent who asked the questions—amounted to custodial interrogation requiring that *Miranda* warnings be provided. *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984)(Miranda warnings not required during routine stops involving traffic matters.)

The government argues that what the agent learned about the presence of a firearm in the car and the apparently expired permit gave the agent probable cause that a firearm was illegally possessed. Therefore, under the automobile exception, a warrantless search of the car was permissible. I disagree. It is true that under the automobile exception "police may seize and search an automobile prior to obtaining a warrant where they have probable cause to believe that the automobile contains contraband." *United States v. Silva*, 742 F.3d 1, 7 (1st Cir. 2014). But here, agent Martinez-Natal did not have probable cause that Mr. Martinez was illegally possessing the gun.  He may have believed he did.  But he was mistaken because, factually, based on the executive order (Exhibit A), the defendant's permit was not really expired.  There was no basis, then, to conclude that Mr. Martinez was illegally possessing the firearm.  The government has not challenged the validity nor the scope of the executive order.  The government posits only that agent Martinez-Natal's ignorance of the executive order was understandable under the circumstances and that, at most, it was a reasonable mistake of law.

"[S]earches and seizures based on mistakes of fact can be reasonable', so long as the mistake is an objectively reasonable one." *United States v. Potter*, 78 F.4th 486, 488 (1st Cir. 2023)(*quoting Heien v. North Carolina*, 574 U.S. 54, 60, 135 S. Ct. 530, 190 L. Ed. 2d 475 (2014)). Likewise, reasonable suspicion—and probable cause for that matter—"can  rest on a mistaken understanding of the scope of a legal prohibition." *Heien*, 574 U.S. at 60; *see also United States v. Washington*, 455 F.3d 824, 827 (8th Cir. 2006).  But as with mistake of fact, the mistake of law "must be objective reasonable" because "an officer can gain no Fourth Amendment advantage through sloppy study of

the laws he is duty-bound to enforce." *Potter*, 78 F.4th at 488 (*quoting Heien*, 547 U.S. at 66-67). The "subjective good faith belief about the content of the law is irrelevant to our inquiry, 'for officers have an obligation to understand the laws that they are entrusted with enforcing, at least to a level that is objectively reasonable.'" *United States v. Washington*, 455 F.3d at 827.

I find that officer Martinez-Natal's ignorance of the executive order that extended the validity of Mr. Martinez' permit was not objectively reasonable under the circumstances. The government only offers that the lack of familiarity with the executive order was understandable because "COVID threw into disarray many well-known ambits of life, to include numerous ways citizens interfaced with the government for matters like licensing" and because "the number of ever-changing executive orders issued during the onset of the pandemic was overwhelming." (Docket No. 112). However, as an officer that is duty-bound to enforce the law, and as per his own testimony that he has received training, he should have known about an executive order that was in place for more than two years before the intervention in this case, that extended the validity of firearm permits. *See United States v. Forjan*, 66 F.4th 739, 746-47 (8th Cir. 2023)(deputy's mistaken belief that defendant's vehicle had an expired registration was not objectively reasonable).

The facts of this case evince that the lawfulness of interactions with citizens is called into question when a police officer is unaware, due to sloppy study of, or lack of effort to learn, legal provisions that he would have to apply on a day-to-day basis. True, COVID threw into disarray many aspects of life. But executive orders were the norm during this period. And while some were "ever changing", the executive order at issue

here was in effect for quite some time. I just cannot conclude that it was objectively reasonable for officer Martinez-Natal to be unaware of the executive order when it was his job as a patrol officer to interact with citizens who would be covered by the amnesty granted by said order. During this time, and today, executive orders were widely disseminated and could be found in government websites such as the Puerto Rico Department of State website.[3] *Cf. United States v. Morris*, No. 20-cr-00167, 2021 WL 141799, 2021 U.S. Dist. LEXIS 7548 at *10 (S.D.W. Va. Jan. 14, 2021)(finding that it was objectively reasonable for a police officer not to be aware of executive order extending validity of an apparently expired vehicle registration because the executive order was issued in **another state**.).

In sum, while the stop was justified at its inception by probable cause that traffic violations occurred, the agent lacked probable cause to search the vehicle. The automobile exception does not apply. However, my finding here does not mean that suppression is warranted. I must decide, as argued by the government, if the defendant voluntarily consented to the search and/or whether the inevitable discovery doctrine applies. I tackle each issue in turn.

### *Consent*

The law is clear that "a warrantless search maybe conducted with the voluntary consent of a person authorized to give such consent" but cannot "exceed the scope of the consent granted." *United States v. Chaney*, 647 F.3d 401, 405-06 (1st Cir. 2011). To

---

[3] Ordenes Ejecutivas (pr.gov)

assess whether consent was given voluntarily, courts must consider "the totality of the circumstances, including the persons' age, education, experience, intelligence, and knowledge of the right to withhold consent." *United States v. Ramdihall*, 859 F.3d 80, 89 (1st Cir. 2017)(*quoting United States v. Forbes*, 181 F.3d 1, 6 (1st Cir. 1999)).  I must also consider "whether [the defendant] was advised of his . . . constitutional rights and whether permission to search was obtained by coercive means or under inherently coercive circumstances." *Id.*  The scope of the consent is measured "by a test of objective reasonableness: What would the typical reasonable person have understood by the exchange between the officer and the [defendant]?" *United States v. Melendez*, 301 F.3d 27, 32 (1st Cir. 2002)(*quoting Florida v. Jimeno*, 500 U.S. 248, 251, 111 S. Ct. 1801, 114 L. Ed. 2d 297 (1991)).

Whether the defendant voluntarily consented to the search of his car is a closer question.  The consent given appears to be free of coercion in the sense that the defendant voluntarily signed the form and did not appear to have questions about it. Also, from the evidence presented, there was no indication that he lacked the capacity to understand what he was doing.  The circumstances surrounding the signing of the consent do not suggest that the police employed coercive means.  However, the consent given, and the scope of it, was tainted by agent Martinez-Natal's mistake as to the validity of the firearms permit. In other words, it was objectively reasonable for Mr. Martinez to be influenced in his decision to consent by the erroneous information he was being provided and the show of authority by the agent. Although I find that there was no deliberate deception, the actions of the agent suggested to the defendant that he was not free to withhold consent, or at the very least, that it was futile to do so. After all, the defendant

was instructed by the officer that in situations of an expired firearms permit, police procedure mandates that the firearm and ammunition be seized.[4]   Mr. Martinez is told this as he is ordered out of his vehicle and before he is advised of his constitutional rights. The above supports a finding that is more likely than not that consent was vitiated.  But that is not the end of the matter.

Assuming, that the consent given was truly tainted by police misconduct, I still must decide if the Court should apply the exclusionary rule.   Suppression is not warranted where the causal link between the initial illegality and subsequent consent is "sufficiently attenuated." *United States v. Serrano-Acevedo*, 892 F.3d 454, 460 (1st Cir. 2018).  The government bears the burden of proving that there was a sufficient break in the causal connection between the illegality and the consent. *See Brown v. Illinois*, 422 U.S. 590, 604, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975); *see also United States v. Navedo-Colon*, 996 F.2d 1337, 1339 (1st Cir. 1993). Several factors are relevant to the inquiry: "temporal proximity", "the presence of intervening circumstances" and "the purpose and flagrancy of the official misconduct." *Brown v. Illinois*, 422 U.S. at 603-04.  To invoke the fruit of the poisonous tree doctrine and to trigger the exclusionary rule, the police conduct must have "significantly influenced" or "played a significant role" in the subsequent consent. *United States v. Cordero-Rosario*, 786 F.3d 64, 76 (1st Cir. 2015).

---

[4] To the extent that the government argues that the scope of consent given authorized an unrestricted and unlimited search of the vehicle, I disagree with this too. The evidence presented at the hearing demonstrates that Mr. Martinez understood that he was only authorizing the agent to enter his car to seize the firearm and any ammunition.  Agent Martinez-Natal's testimony is consistent with this understanding of the scope of the search. Having said that, I do find that such understanding included any place and containers where firearm and ammunition could be found. *United States v. Melendez*, 301 F.3d at 33.

Here, on the one hand, Mr. Martinez' consent was given almost immediately after the erroneous determination of the agent to remove him from the car and there were no intervening circumstances.  On the other hand, as previously found, the officer was operating under a mistake of law, eliminating the possibility that the consent was obtained through a purposeful exploitation of a Fourth Amendment violation. *Cf. Pagan-Gonzalez v. Moreno*, 919 F.3d 582, 597-98 (1st Cir. 2019).  On balance, two out of the three factors lead to the conclusion that there is no sufficient attenuation in this case. *United States v. Cruz-Montanez*, No. 16-467, 2017 WL 2670763, 2017 U. S. Dist. LEXIS 96079 at * 23-34 (D.P.R. Jun. 12, 2017).

### *Inevitable Discovery*

The government contends that because the vehicle was going to be seized and inventoried in any case, the drugs, firearm, and ammunition would have been inevitably discovered "even if there had been no probable cause to search the car and even if the Defendant had not consented." (Docket No. 112 at 7).  Mr. Martinez made absolutely no effort to respond to or oppose this argument except for a conclusory one-liner in his post-hearing brief stating that "[t]he traffic violations that Puerto Rico police issued [sic] for not adhering the validation sticker to the window [sic] and for making an illegal change of lanes do not warrant a subsequent inventory search." (Docket No. 111 at 14).  But this argument misses the point.  As to this issue, I agree with the government's position.  Even if the consent was tainted, and the search invalid, "suppression would not lie in this instance because the contraband inevitably would have been discovered." *United States v. Zapata*, 18 F.3d 971, 978 (1st Cir. 1994).

25

"[E]vidence derived from unlawful searches is generally subject to suppression." *United States v. Scott*, 270 F.3d 30, 42 (1st Cir. 2001). But the exclusionary rule does not bar the use of unlawfully obtained evidence in "any case in which the prosecution can show by a preponderance of the evidence that the government would have discovered the challenged evidence even had the constitutional violation to which the defendant objects never occurred." *Id.* (*citing Nix v. Williams*, 467 U.S. 431, 440-48, 104 S. Ct. 2501, 81 L. Ed 2d 377 (1984); *see also United States v. Cordero-Rosario*, 786 F.3d at 73. The inevitable discovery rule analysis encompasses three questions:

> [F]irst, whether the legal means by which the evidence would have been discovered was truly independent; second, whether the use of the legal means would have inevitably led to the discovery of the evidence; and third, whether applying the inevitable discovery rule would either provide an incentive for police misconduct or significantly weaken constitutional protections.

*United States v. Almeida*, 434 F.3d 25, 28 (1st Cir. 2006).

Furthermore, under their community caretaking function, law enforcement officers need not have probable cause or obtain a warrant before conducting a search or seizing property. *Boudreau v. Luisser*, 901 F.3d 65, 71 (1st Cir. 2018). In their role as community caretakers, officers may "remove vehicles that impede traffic or threaten public safety and convenience." *Id.* at 72. And based on the community caretaking exception to the warrant requirement, Courts have regularly approved inventory searches of impounded motor vehicles. *See, e.g., Colorado v. Bertine*, 479 U.S. 367, 371, 93 L. Ed. 2d 739, 107 S. Ct. 738 (1987); *United States v. Rivera*, 988 F.3d 579, 581-83 (1st Cir. 2021); *United States v. Ramos-Morales*, 981 F.2d 625, 626 (1st Cir. 1992) (collecting cases).

The evidence presented at the suppression hearing established that Mr. Martinez could not legally drive the car away due to his expired driver's license.[5]  Agent Martinez-Natal explained that the procedure to be followed was to seize the vehicle and have it towed to the police station a per police protocol. At the station, an inventory search would be conducted and a form PPR-128 filled out.  The agent more specifically explained that a PPR-128 form is executed following an inventory search "to identify any belonging of value or anything criminal inside it." (Tr.40). This was done in this case in the presence of Mr. Martinez.

Because there is no evidence that anyone authorized to drive the car showed up at the scene, the white Lexus was going to be seized even if the police officers had not made the erroneous determination regarding defendant's firearms permit that prompted the search for, and seizure of, the firearm and ammunition from the car.  Therefore, upon the required inventory search that would have followed, the cocaine would have been inevitable found.   The impoundment and inventory search were legal means truly independent from any Fourth Amendment violation. Again, because a thorough inventory of the vehicle would have been conducted, said search would have uncovered the cocaine inside the lunchbox.  I also find that applying the inevitable discovery rule would not incentivize the police to incur in misconduct particularly because I have concluded that the officer did not engage in deliberate illegality but a mistake of law.

---

[5] In his written submission and during the hearing, the defense vaguely suggested that as in the case of the firearms permit, there may have been an executive order extending the validity of expired driver's licenses. However, no evidence was presented as to that. Certainly, I was not made aware of any such executive order.

Suppression is thus not warranted. *United States v. Corbett*, 2024 U.S. Dist. LEXIS 6443 at *11 (suppression not warranted because government met its burden to show that the vehicle would have been inevitably searched pursuant to standardized inventory policy.)

### Suppression of Statements – Fruit of the Poisonous Tree

The defendant moves to suppress the statement made during a post-arrest interview with ATF agents.  He is not challenging the knowing and voluntary nature of the statement, nor the voluntariness of any waiver of *Miranda* rights. Mr. Martinez merely claims that exclusion is required because the statement is fruit of the poisonous tree. *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). Before delving into the analysis, one clarification must be made. Defendant's post-hearing memorandum avers that he was taken "the next day to ATF office . . . and he gave an interview." (Docket No. 111 at 6).  The evidence shows that the interview at issue in this case was conducted the same day of the arrest, not the next day. (Exhibits 45 and 45A).  I do not read defendant's motions to suppress as challenging any interview given to ATF "the next day."

With the above clarification, this issue is easily disposed of.  Since I have already determined that the inevitable discovery doctrine bars suppression of the physical evidence, there is no poisonous tree. *United States v. Gamache*, 792 F.3d 194, 200 (1st Cir. 2015)(because there was no antecedent constitutional violation, there was no poisonous tree.). Moreover, even if the statement to the ATF agents could be said to be connected to the one instance of unlawful conduct by agent Martinez-Natal (the mistaken belief that defendant's permit was expired), I would find that the circumstances under which the subsequent statement to the federal agents was given have purged any

taint resulting from said illegality. *See Brown v. Illinois*, 422 U.S. at 603-04.  The passage of time (several hours from the time of the search and seizure), the knowing and voluntary waiver or *Miranda* rights (an intervening event), and the lack of flagrancy in agent Martinez-Natal's conduct, all counsel in favor of finding a significant break in the causal connection between any illegality and the statement. *United States v. Stark*, 499 F.3d 72, 76-77 (1st Cir. 2007).  The statement was sufficiently an act of free will and should not be excluded. *Taylor v. Alabama*, 457 U.S. 687,689, 10s S. Ct. 2664, 73 L. Ed. 2d 314 (1982).

### *Good-Faith Exception*

In light of my findings above that suppression is not warranted, I find it unnecessary to address this issue.  I would only observe that it is unlikely that the good faith exception would cure any Fourth Amendment violation here.  Courts are reluctant to apply the exception to warrantless searches.  *United States v. Mata-Pena*, 233 F. Supp. 3d 281, 294 (D.P.R. 2017)(Delgado-Colon, J.). Also, I have already determined that agent Martinez-Natal's mistake of law (ignorance of the executive order) was not objectively reasonable.  There is an incentive in this case to deter his conduct. *See United States v. Ramirez-Rivera*, 800 F.3d 1, 33 (1st Cir. 2015); *United States v. Mota*, 155 F. Supp. 3d 461, 475 (S.D.N.Y. 2016)(refusing to apply good-faith exception to an officer's mistake of law scenario.).

## V.   Conclusion

In view of the foregoing, I recommend that Mr. Martinez' motions to suppress be DENIED.

This report and recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within 14 days**. Failure to file timely and specific objections is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED**

In San Juan, Puerto Rico this 7th day of June, 2024.

S/Héctor L. Ramos-Vega
HÉCTOR L. RAMOS-VEGA
UNITED STATES MAGISTRATE JUDGE